IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| **NICOLE TAYLOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.:** |
| v. | ) | |
| | ) | **REQUEST FOR JURY TRIAL** |
| **WAL-MART STORES EAST I, LP,** | ) | |
| **d/b/a WAL-MART #2994,** | ) | |
| | ) | |
| **Defendant.** | ) | |

SERVE:

    Registered Agent:
    CT Corporation System
    120 South Central Avenue
    Clayton, Missouri 63105

## COMPLAINT

COMES NOW Plaintiff Nicole Taylor, by and through under signed counsel, and for her claims against Defendant Wal-Mart Stores East I, LP d/b/a Wal-Mart #2994 ("Defendant"), states as follows:

1. Plaintiff Nicole Taylor is a resident of the State of Missouri.

2. Defendant Wal-Mart Stores East I, LP d/b/a Wal-Mart #2994 ("Defendant"), is a limited partnership, properly registered and doing business in the State of Missouri at 3022 S Belt Highway, St. Joseph, Buchanan County, Missouri 64503.

3. Defendant is comprised of a single General Partner, Wal-Mart Stores East Management LLC ("WSEM"), and a single Limited Partner, Wal-Mart Stores East Investment LLC ("WSEI").

4. Both WSEM and WSEI are single-member LLCs, and the single member of each is Wal-Mart Stores East, Inc.

5. Wal-Mart Stores East, Inc. is a Delaware corporation with its principal place of business in Arkansas.

6. Thus, Defendant is domiciled in both Delaware and Arkansas.

7. Defendant can be served through its Registered Agent, CT Corporation System, 120 South Central Avenue, Clayton, Missouri 63105.

8. This case involves the intentional tort of discrimination and retaliation in employment for exercising rights granted by the Missouri Workers' Compensation Law, in violation of R.S.Mo. § 287.780, *et seq.*

9. Plaintiff worked at Defendant's store located in St. Joseph, Buchanan County, Missouri.

10. Defendant took adverse actions against Plaintiff, including discharging Plaintiff, at Defendant's facility in St. Joseph, Buchanan County, Missouri.

11. Defendant employs more than five people and is an "employer" within the meaning of the Missouri Worker's Compensation Law pursuant to § 287.030, R.S.Mo.

12. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because complete diversity exists amongst the parties and the amount in controversy exceeds $75,000.

13. Venue is proper in the St. Joseph Division of this Court pursuant to 28 U.S.C. § 1391(b)(2) and Local Rule 3.2(b)(1).

### RETALIATION BASED ON THE EXERCISE OF WORKERS' COMPENSATION RIGHTS IN VIOLATION OF R.S.MO. § 287.780

14. In December 2018, Plaintiff was hired by Defendant to work at one of Defendant's stores in Wichita, Kansas.

15. In approximately March 2019, Plaintiff was transferred to Defendant's store in St. Joseph, Missouri, to work as a Grocery Sales Associate.

16. Plaintiff continued in this position at this store until her discharge from employment on June 5, 2019.

17. Plaintiff's duties including stocking the grocery section of Defendant's store, unloading freight, and assisting customers as needed.

18. Plaintiff primarily worked from 4:00am to 1:00pm each shift.

19. On May 24, 2019, Plaintiff was restocking cereal on a top shelf.

20. To complete this task, Plaintiff was using a ladder.

21. As Plaintiff descended the ladder, her left foot missed a step, causing her to land abruptly and awkwardly on her left leg, twisting her hips sharply.

22. As a result of the accident, Plaintiff suffered injuries to her left lower extremity and left hip.

23. Plaintiff felt pain as a result of this occurrence, but assumed it would subside.

24. Plaintiff completed her assigned shift, working approximately two hours after suffering her work-related injury.

25. Plaintiff rested her injured left leg and hip that afternoon and evening.

26. Plaintiff reported to work the following morning for her assigned shift.

27. However, as Plaintiff completed the first half of her assigned shift, Plaintiff's lower left extremity and left hip began causing her tremendous pain.

28. Plaintiff began altering her gait due to the pain.

29. Around 8:00am, Plaintiff notified Assistant Store Manager Kyle Freeman of her pain and her accident the previous day.

30. Plaintiff asked Freeman to send her for medical treatment.

31. Freeman told Plaintiff to wait while he consulted with two other management employees, Assistant Store Manager Richard Inda and Rose l/n/u about Plaintiff's injury and request for medical treatment.

32. After a bit, Freeman returned to Plaintiff with Inda and Rose.

33. Freeman told Plaintiff that the group did not want to send Plaintiff to the doctor that day.

34. Freeman stated that would "count against Saturday's accident numbers" if Plaintiff went that day.

35. Instead, Freeman suggested that Plaintiff take her lunch and see if her pain subsided.

36. Plaintiff was very upset by this instruction, but did as she was told.

37. As Plaintiff was walking to the breakroom, she was stopped by a co-worker, Brenda Shaffer.

38. Shaffer asked Plaintiff if she was alright, as Plaintiff was limping and looked upset.

39. Plaintiff told Shaffer what had transpired with Freeman, Inda, and Rose.

40. Upon information and belief, Shaffer was asked for a written statement several days later and recounted this exchange.

41. Shortly after Plaintiff's lunch break ended, she returned to Freeman, Inda, and Rose to report her pain was unchanged.

42. Plaintiff was instructed to call a number to speak to a Medcor representative.

43. The representative asked Plaintiff about her symptoms, then instructed Plaintiff to "self-care" over the next several days to see if her pain improved.

44. After the call ended, Plaintiff asked if she would be able to actually be examined by a doctor at that time.

45. The managers suggested that instead of actually being physically examined by an authorized treating physician, Plaintiff should clock out early and go home to rest.

46. Plaintiff did as she was instructed.

47. Plaintiff reported to work again on Sunday, May 26, 2019.

48. Plaintiff clocked in and reported to the overnight supervisor, Jess or Jenn (hereinafter "JE").

49. JE asked Plaintiff: "Are you the one who was hurt?"

50. Plaintiff replied that she was hurt and related her continuing symptoms to JE.

51. JE told Plaintiff that Plaintiff would need to "deal with this" after the holiday weekend (the following day was Memorial Day).

52. JE instructed Plaintiff to clock out and go home.

53. Plaintiff did as she was instructed, clocking out and leaving the store.

54. Plaintiff was scheduled to be off from work the following two days.

55. Plaintiff returned to work on Wednesday, May 29, 2019.

56. Plaintiff asked about being sent for authorized medical treatment, as she was still in tremendous pain.

57. Plaintiff was told to wait until the Store Manager, Corey Henderson, arrived around 7:00am, and that Henderson would handle things.

58. Plaintiff worked for approximately three hours while she waited for Henderson to arrive.

59. Once Henderson arrived, Plaintiff reported her injury and need for medical treatment to Henderson.

60. Henderson gave Plaintiff an "Associate Incident Report" form to complete.

61. On the form, Plaintiff noted that she had informed Freeman of the injury on May 25—four days earlier.

62. The form also indicated that Defendant was to notify Defendant's workers' compensation insurer and submit the report within 24 hours of receiving notice of the injury.

63. Plaintiff was sent to Concentra for an authorized medical examination for her work-related injuries that day, May 29.

64. Plaintiff was placed on work restrictions, which included lifting restrictions of no more than 5lbs and seated work for at least half of Plaintiff's shift.

65. However, Plaintiff received no treatment at this visit, nor any pain medications or adjustment to address her pain in any way.

66. Instead, Plaintiff was prescribed physical therapy which would ultimately began the following week.

67. Plaintiff returned to the store with her work restrictions.

68. Plaintiff was provided with a light duty assignment by Sabrina Shunk.

69. Upon information and belief, Shunk serves in a work comp coordinating role for Defendant at the St. Joseph store.

70. Plaintiff was assigned to the fitting room desk, where she was to answer phones and assist customers for the first four hours of her shift.

71. For the remainder of her shift, Plaintiff was assigned "zoning" duties, including straightening merchandise and assisting customers.

72. Plaintiff reported for her light duty assignment the following day.

73. Plaintiff performed the first half of her assignment.

74. However, during this time, Plaintiff found that she was often required to stand and walk in order to allow customers into fitting rooms and while assisting customers.

75. Even this limited amount of walking and standing caused Plaintiff great pain.

76. At the end of this first four-hour assignment, Plaintiff found a supervisor and reported that she wanted to use paid-time off for the afternoon due to her pain.

77. Plaintiff was told she could do so.

78. Plaintiff clocked out and went home.

79. Plaintiff returned to work the following day, still in great pain and still having received no authorized medical treatment for her pain.

80. Plaintiff had a nearly identical experience during the first half of her shift.

81. This resulted in Plaintiff experiencing increased pain as she prepared for the second part of her shift.

82. Plaintiff again requested to use paid-time off for the afternoon due to her pain.

83. Plaintiff was again allowed to do so.

84. Plaintiff was scheduled to be off work the following two days.

85. On the morning of June 3, 2019, Plaintiff awoke in tremendous pain.

86. The pain was much worse than it had been since the date of injury.

87. Plaintiff called in to both Defendant's attendance line and to Shunk.

88. Plaintiff described her symptoms to Shunk and asked to return for authorized medical treatment.

89. Plaintiff returned to Concentra that day.

90. The nurse practitioner prescribed Plaintiff strong pain medications to address her continued pain.

91. The nurse practitioner also modified Plaintiff's work restrictions to require seated work only, with Plaintiff being given opportunity to stretch and change positions as needed to address her pain.

92. Plaintiff awakened during the night by her tremendous pain.

93. As Plaintiff attempted to get out of bed, Plaintiff found she could barely walk due to pain in her left hip and shooting down her left leg.

94. Plaintiff again called in to both Defendant's attendance line and to Shunk.

95. Shunk arranged for Plaintiff to return to Concentra for her second visit in two days due to the increased pain.

96. At the appointment, the nurse practitioner told Plaintiff that she would need to see the MRI of Plaintiff's hip before a more definitive diagnosis could be made.

97. The MRI had been ordered but not yet performed.

98. Plaintiff was instructed to continue on her pain medications and begin physical therapy to see if that relieved any of her symptoms.

99. Plaintiff's work restrictions from the previous visit were kept in place.

100. Plaintiff was scheduled to be off work the following day.

101. On June 5, 2019, Plaintiff received a call from the insurance adjuster assigned to her workers' compensation claim.

102. The adjuster questioned why Plaintiff had gone to Concentra two days in a row.

103. Plaintiff related that she had been experiencing tremendous pain both of those days, and sought treatment for that pain.

104. The adjuster told Plaintiff: "You aren't going to be one of those that [sic] runs up the bills for no reason. I don't have those on my claims."

105. Shortly after this call, Plaintiff received a call from management members of Defendant.

106. Specifically, three Assistant Store Managers, Maria Fugate, Inda, and Mary Beauford, were on the call with Plaintiff.

107. Fugate asked Plaintiff why Plaintiff had not come to work the past two days.

108. Plaintiff explained what had been happening with her treatment and that Shunk was notified about the absences.

109. Fugate told Plaintiff: "Well, the doctor said you can work."

110. Fugate told Plaintiff she had been assessed points for those missed days, as well as May 26.

111. Fugate told Plaintiff that Plaintiff was being discharged due to the amount of points she had been accessed.

112. Plaintiff replied that she planned on calling an attorney.

113. Fugate immediately stopped Plaintiff and told Plaintiff: "Well, if that's the case then we can no longer speak to you."

114. Fugate then terminated the call.

115. Following her discharge from employment, Plaintiff sought off work benefits as she continued her treatment.

116. Defendant refused to pay such benefits, alleging that Plaintiff had been discharged for points assessed on May 26, June 3, and June 4.

117. Plaintiff's legal counsel repeatedly requested time records for May 26, to show that Plaintiff had clocked in for work and been told to go home by her supervisor.

118. Legal counsel for Defendant provided an Excel spreadsheet with information entered into it, but not for any date after May 24, 2019.

119. Defendant took the position that Plaintiff had never worked after May 24, 2019—her date of injury.

120. Plaintiff produced to Defendant a record showing a deposit from Defendant on June 13, 2019 for approximately 27 hours—exactly what Plaintiff has alleged she worked from May 25, 2019 to her date of discharge.

121. Defendant has refused to respond to this document with any additional records.

122. The authorized treating physician selected by Defendant recommended that Plaintiff undergo surgery on her hip.

123. Surgery was scheduled for January 2020.

124. Defendant refused to authorize the surgery, causing it to be cancelled.

125. Instead, Defendant elected to find another doctor who opined he did not believe that a diagnostic or exploratory his arthroscopy had a high probability of predictable success.

126. Defendant has a nationwide history of abusing its points system to discharge injured employees and employees suffering from disabilities.

127. This abuse is so prevalent that it become a focal point of opposition for several workers' rights organizations across the United States. *See, e.g.*, Dina Bakst et al., *Pointing Out:*

*How Walmart Unlawfully Punishes Workers for Medical Absences* (2017) (published by A Better Balance, a New York not-for-profit corporation).

128. All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees, acting within the course and scope of their employment, as set forth herein.

129. Plaintiff was injured while in the course and scope of her employment with Defendant.

130. Plaintiff exercised of her rights under the Workers' Compensation Law of Missouri, including, but not limited to, seeking medical care, utilizing work restrictions, convalescing, and pursuing time-off work benefits.

131. Defendant took adverse actions against Plaintiff, including but not limited to interfering with Plaintiff's ability exercise her workers' compensation rights and discharging Plaintiff from employment.

132. The motivating factor in these adverse actions taken by Defendant with respect to Plaintiff's employment was Plaintiff's exercise of her rights under the Workers' Compensation Law of Missouri.

133. The reason provided for Plaintiff's discharge directly references her exercise of such rights.

134. The adverse actions of Defendant, including Plaintiff's discharge from employment, were acts of retaliation, in violation of 287.780 R.S.Mo. which states as follows:

> No employer or agent shall discharge or discriminate against any employee for exercising any of his or her rights under this chapter when the exercising of such rights is the motivating factor in the discharge or discrimination. Any employee who has been discharged or discriminated against in such manner shall have a civil action for damages against his or her employer.

135. This is part of a large pattern and practice of retaliation by Defendant that is known, sanctioned, and enforced on a national level.

136. The conduct of Defendant, as set forth above, was done with evil motive or in reckless disregard for the rights of Plaintiff.

137. As a direct and proximate result of Defendant's unlawful conduct, including wrongfully discharging Plaintiff's employment, Plaintiff has suffered irreparable injury, including past and future pecuniary issues, loss of employment opportunities, emotional pain, suffering, humiliation, inconvenience, mental anguish, and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants relief.

WHEREFORE, Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $75,000.00; for punitive damages; for Plaintiff's costs and expenses occurred herein; and for all other relief deemed just and proper by this Court.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a trial by jury on all accounts and allegations of wrongful conduct alleged in this Complaint.

Respectfully submitted,

 */s/ Daniel L. Doyle*_____
Daniel L. Doyle, MO Bar No. 37305
Robert A. Bruce, MO Bar No. 69985
DOYLE & ASSOCIATES LLC
748 Ann Avenue
Kansas City, Kansas 66101
Telephone: (913) 371-1930, ext. 109
Facsimile: (913) 371-0147
d.doyle@ddoylelaw.com
r.bruce@ddoylelaw.con
ATTORNEYS FOR PLAINTIFF